### AT A SPECIAL SESSION HOLDEN AT COLUMBUS, DEC., 1823.

---

### LUCKY v. BRANDON AND OTHERS.

Debtor imprisoned within the jail limits may go into private houses, or labor on private ground within such limits, without being guilty of an escape.

Monuments not necessary to define the prison limits. It is sufficient to describe them by definite mathematical lines.

THIS was an action of debt upon a prison bounds bond, originally prosecuted in the common pleas of Stark county, and brought before the Supreme Court by appeal. It was reserved for decision upon a statement of facts agreed and subscribed by the counsel as follows:

It is agreed between the parties in this cause, that James Brandon, after giving the bond as mentioned in the declaration of the plaintiff, and before the sheriff liberated him, to wit, between the 27th August and 20th September, 1819, went off of the public grounds and streets in the town of Canton, and frequently wrought by days together on private property; that he was often in Tuscarawas street as far as the center thereof during the period aforesaid. It is further agreed that the affidavit writ hereto attached was made by said Brandon before James Williams, Esq., a justice of the peace, on 25th August, 1819, as certified by said justice;

52

that notice of such affidavit and oath was given to the counsel of Lucky within a short period thereafter, who furnished money on his own account to the amount of ten dollars, ·to support said Brandon in prison, which was expended for that purpose at the rate prescribed by law; and that when that was so expended, the counsel refused *to furnish any more funds for that purpose, [50 but did not, on-the part of his client, permit or authorize the discharge of said Brandon, nor did he, in any wise on behalf of his client, refuse to support the said Brandon. And that Lucky, the plaintiff, never had notice of said oath or affidavit until after the discharge and enlargement of the said Brandon. And that Lucky, the plaintiff, lived in Wayne county, twenty-two miles from Canton, and his counsel lived at Steubenville, Jefferson county, fifty-eight miles from Canton.

The affidavit referred to was made by Brandon, and alleged that he had not the means of supporting himself in prison.

The certificate of prison rules was as follows:

The court affix the following as the jail bounds of Stark county:

South of the jail to Tuscarawas street inclusive.

West of the jail to Poplar street inclusive.

North of the jail as far as the in-lots of the town of Canton extend.

East of the jail as far as Walnut street in Canton inclusive.

GOODENOW, for plaintiff:

On the facts agreed, the plaintiff will contend that he is entitled to judgment for the amount of the penalty of the bond.

1. Because the plaintiff was entitled to *personal* notice of the prisoner's having taken the oath that he was unable to support himself in prison, before he could be made chargeable with his support, or could be charged with the consequences of a neglect or refusal to support him. This point I will dismiss with one observation only. It seems to me absurd to say, that a plaintiff shall forfeit his right to hold the body of his debtor in restraint—a right guarantied to him by the common law of the land, the common consent of mankind, and the constitution of the state, by a mere implication of law, arising. out of a statutory provision, made in derogation of that law which jurists call the *substratum* of all our laws; for it is certainly repugnant to common sense to say, a man *refuses* or *neglects* to do that which he could not have known

53

it was necessary for him to do, otherwise than by *supposing* he was bound to know what it is agreed he did not know.

2. That James Brandon committed an *escape* between the 26th August and the 20th September, 1819, by "going without the limits of the liberties of the jail," as the same were fixed during said time. It will here become necessary to decide, what were the limits of the liberties of the jail. Under this head I shall inquire.

51] *1. Whether the court of common pleas can extend the walls of the prison *over private property*, so as to make it a part of the prison, that the debtor *in prison*, who has given bonds, can "work for days together" thereon, and still be "within the *limits of the liberties of the jail*"—*within its walls.* If by any *fiction* the affirmative could be supposed, it would be a fiction against the *truth* and against the *legal* legitimate results flowing from the fact. By a *fiction*, the walls are *extended*, when *in fact* they are not; but the *intention* of the law is thereby effected, while that fiction travels not inconsistent *with the law;* when it does run repugnant to the law, as it does the moment it encroaches upon private property, it creates uncertainty, confusion, and injustice.

The *rules of the King's Bench prison* in England never include private property, unless it be that over which the marshal has a control and possession, as will be seen by examining the rules. 6 Term Rep. 305, 778. Yet there would be more propriety in embracing private property in those *rules* than in our *limits*, for the prisoner *there* is at the *risk* of the marshal, and every moment at his mercy and control, and can not, as he can *here*, claim the *liberties* as a *right* on giving bond: *there* the marshal may or may not allow the *rules* to his prisoner, and when once allowed, he may put a period to the indulgence when he pleases, and imprison the debtor in *stronghold.* The rules are merely an indemnity to the marshal, excusing him for thus indulging his prisoner. Besides, his prison is changeable : he may locate it where he pleases, with the assent of the court, and it is not always a particular spot or building exclusively belonging to the public.

Not so *here :* our jails are county property exclusively, occupied by the state in some instances only; and how it can be supposed that their walls can be, by fiction of law, mingled, or rather jumbled, with private property, houses, outhouses, gardens, private walks, and the utmost retired recesses of our domestic firesides, for

the purpose of extending those walls to accommodate a prisoner—
and yet the sheriff, or jailer, dare not step a foot upon such pri-
vate domain without leave—is to me incomprehensible on legal
principles.

What are the provisions of our laws on the subject? Our con-
stitution provides that a man's body shall not be confined in prison
after delivering up his estate, unless on strong presumption of
·fraud. This is a clear recognition of the creditor's right, as it ex-
isted at the formation of that instrument, to coerce payment by
imprisonment. Our act of the general assembly, passed *Jan- [52
uary 12, 1805, provides that every person imprisoned on mesne
process or execution shall be permitted and allowed the privilege
of prison bounds, which are or may be laid off and assigned by
*metes and bounds around and adjoining each county jail*, by the
judges of the court of common pleas, etc. The condition of the
prisoner's bond is for his "safe continuing in the custody of the
jailer within the limits of his prison bounds," until legally dis-
charged. Can this law be construed as giving the court power to
assign *private property*—to say that the walls of the prison shall
extend over my garden, lands, or houses? I think not; and
should the court transcend their power, their acts would be, *ipso
facto*, void. Baxter *v.* Taber, 4 Mass. 361. But let me ask,
how the court can establish "*metes or bounds*" upon my land, or
run a line across it for that purpose; or how can a lot owned by
me exclusively, separated by a dozen lots of other men, be said to
adjoin, or to be around, the county jail? Can they run an *ideal*
line, and send the prisoner upon it, when neither they nor any
other officer in the county dare follow?

What shall we take as a guide; what *data*, by which to deter-
mine whether, upon this act of the assembly, the court can cover
private property with the "*huge walls of a prison*," or even give it
the character of a prison? ·Had the legislature intended any such
thing, and the court had pursued such intention, it would be a
violation of the constitution. Baxter *v.* Taber. But we have no
reason to infer that the legislature had any such intention. It is
manifest they had not, from the language they have used; and,
besides, the known and settled principles and doctrines of the
common law of the land must have been present to the legislative
mind, when the act was passed, as they are now to the court, and
if any such innovation was intended, it would have been ex-

pressed, and not left to implication. A reference to the laws, usages, and decisions of our sister states, will enlighten this subject, perhaps, to advantage.

In *New Jersey,* "the inferior courts of common pleas are empowered and required to make and lay out the bounds and rules of the prisons in their several counties, not exceeding three acres of land adjoining such prison." The condition of the *bond* is, that the "prisoner keep within said bounds," and on giving the bond, "he shall have liberty to walk therein." Laws of New Jersey, Trenton edition, 1821, 426.

In *North Carolina,* the county courts have power to make out such a parcel of land as they shall think fit, not exceeding six acres, adjoining to the prison, for the rules thereof;" and every prisoner, 53] *etc., on giving bond, "to keep within the said rules, shall have liberty to walk therein, out of the prison, for the preservation of his health." Laws of North Carolina, 150.

In *New York,* the law provides, that "It shall be lawful for the court of common pleas to appoint a certain reasonable space of ground adjacent to the jail of the county, to be denominated the liberties thereof, etc.; and such court shall cause the same liberties and their limits to be designated by *inclosures and posts,* or other visible marks placed on the outer lines of said liberties;" and the condition of the bond for the liberties, is, "that such prisoner shall remain a true and faithful prisoner, and shall not at any time nor in any wise escape or go without the limits of the liberties aforesaid, until discharged by due course of law." 1 N. Y. Laws, 428.

In *Massachusetts,* "the court of general sessions of the peace shall fix and determine the jail yards to the several jails appertaining to their several counties;" and the condition of the bond is, that "from the time of executing such bond, he will continue a true prisoner in the custody of the jailer and within the limits of the prison, until he be lawfully discharged, without committing any manner of escape. Laws of Mass. 1784, M. 41.

It appears from the laws of the different states—and I have referred to such as came most conveniently to my hand—and the decisions of their courts, and long and uniform usage, that the liberties of the prison, the prison bounds, or the yard of the jail, or by what other name soever the same may be called, is but *an extension of the walls of the prison;* and the *lines, posts, marks,* or *in-*

*closures* of such yard or liberties, are those walls. Peters and Gedney *v.* Henry, 6 Johns. 121; Baxter *v.* Taber, 4 Mass. 361. See also Bonafous *v.* Walker, 2 Term Rep. 126. And such has been the decision of this court on the statute of Ohio, allowing *liberties* to debtors in prison.

Hence I would again inquire: Can private property, upon which it is agreed that *James Brandon* "wrought for days together," be considered within the walls of the prison? I think not, even should it be decided that the *limits of the liberties,* as assigned by the court of Stark county, *extend around* any private property. The court, in the case last cited from Massachusetts, say, that they "can not admit that the sessions can, by any order of theirs, make the private property of others, of which by law they have the exclusive use, a part of the county prison;" and where is the discrepancy between their prisons and the powers of their sessions, and our prisons *and the powers of our courts of common pleas? There [54 is none in law or reason, whatever the devious practice of either may have been; and none can be created without a departure from the long and inveterately settled doctrines of the common law, distinguishing between public and private rights, and between the rights of creditors and those of debtors. And I can not find a case in any of the reports of the states, where the question was directly presented for decision, wherein it has not been unhesitatingly and unanimously decided that private property can not become a part of a public prison. "It is urged," continues the enlightened court of Massachusetts, in the case above cited, "that by virtue of this clause [the clause of the law which has been cited, giving power to the sessions] the sessions may extend the limits of the jail yard at its pleasure, including within its limits a whole town, and making every man's house and land a part of the prison, of which the sheriff has the custody." "We are satisfied, however, that *no opinion could have less foundation.*" "To give a power of this extent to the sessions, could not have been within the intent of the statute; and if the legislature had intended it, it is manifest that the execution of the power would have been unconstitutional, as it would have been an appropriation of private property to public uses, without compensation to the proprietor."

Should a distinction be attempted to be drawn between the "prison yards" of *Massachusetts* and our "prison bounds," I think the attempt will be abortive, as to the question now before the court.

It is not arguing soundly or legitimately, to say, that although the limits of the liberties, embracing or including within their lines private property, do not give the prisoner a *right* to go upon such private property at his own will and pleasure, yet permit him to go if the owner will give him license. If the *law* does not give him the *right* to go upon private property, he is *out of the custody of the jailer* if he steps upon it. This potential right, which may be exercised with the permission of a third person, the owner of the property, is inconsistent with the privilege purchased by his bond, upon giving which the law says, he "*shall be permitted and allowed the privilege of prison bounds;*" and is inconsistent with the restraint imposed upon him by the laws of the land. This is an irrefutable answer to all such logic.

But suppose we inquire a little closer into this matter. What privilege does the prisoner acquire by the bond, and what has been the object of allowing him that privilege? The object, with all legislatures who have passed laws on the subject, has not been to take away from the creditor *his privilege* of coercing his unwilling debtor by the restraint of his liberty, or to render that restraint ineffectual; but it has been, in the language of the law of North Carolina, "to preserve his health"—for air and exercise. And the privilege acquired by the debtor in prison, is, in the language of almost every statute of the different states on the subject, "*to walk*" within the limits of the prison bounds. But I am willing to be as liberal as the most flexible principle of the law will justify, and say, that he may go anywhere within the liberties, either in the night season or the day-time, for his convenience, comfort, pleasure, benefit, or recreation. But there should be some *limits* to these limits of the prison walls, known and certain "by metes and bounds," that parties may know their rights, if they have any left. And I beg the court to allow me to refer them to the opinion of the court, delivered by Chief Justice Parsons, in the case of Baxter *v.* Taber, before cited.

Arguments from convenience and common usage under a law—for even twenty years of its open violation, to the infringement of the long established constitutional rights of parties, it seems, ought to be listened to with caution. And I may well ask, can the most solemn decision of this court, in support of an illegal usage, render it legal? It is fashionable, I know, at this day, to talk of the liberty of the citizen, and the barbarity of imprisoning a man for

debt: but such language ought not to be addressed to judicial trib-
unals, but to the ear of the legislature; and let it be remembered,
that " inconvenience to individuals can not alter the law, nor bend
it to particular cases;" that there is no *necessity,* even for the legis-
lature to allow the indulgence to prisoners for debt, which are con-
tended for. That imprisonment for debt might be abolished, has
been my prayer during my life; but while the legal right remains
to the creditor, it must have its legal measure. If the prisoner, who
is confined for debt, does not avail himself of the benefit of the *insolv-
ent law,* and give up his property; nor take the *oath* that he is una-
ble to support himself in prison, the presumption is he has the
means of support and of paying his debts, but means to defraud his
creditors. If he does give up his property, he is beyond the reach
of imprisonment; and if he takes the *oath,* the creditor is bound to
support him *in prison,* and pays the jailer for his food at his table,
and for lodgings in his house; and if bond be given for the liberties,
the prisoner is entitled to free air and exercise *within the limits.*
\*But to say that he shall enjoy the same liberty and privilege [56
as any other man in the town wherein the jail is located, or within
the *imaginary intended walls* of the prison, is at once making a
*gentleman* of him, entirely above his neighbors—enjoying all that
others can, "faring sumptuously every day," and bidding defiance
to his creditors. This is taking from the creditor *his rights,* and is
administering *partial and unequal justice:* the man in town has a
privilege that one in the country has not: the law operates as a
restraint upon one and not upon the other. This, as the court say
in the case of Baxter *v.* Taber, is stripping the law of that impar-
tiality which is one of its vital principles.

2. But one other consideration is submitted to the court upon
which no argument can be really necessary. There is not, *in fact,*
by the pretended assignment of prison bounds by the court of Stark,
any space whatever " laid off and assigned by metes and bounds
around and adjoining said jail." The wood *" inclusive,"* wherever
it is used in the copy of the journal of the court of common pleas
of Stark county, herewith presented to the court, can claim and
receive no other than its appropriate sense, its common acceptation.
To extend a point or a line to another point or line, *inclusive,* is a
new expression, or use of terms. But, say it means to include the
thing extended *to;* how much is there included in the first line
drawn by the court of Stark—" south of the jail to Tuscarawas

street inclusive ?" Does it include the intermediate space between the jail and Tuscarawas street—or does it include the width of that street, which would add so much to the *extent* of that line—or does it include the *width* of that street, and also its extent east to the intersection of Walnut street, and west to the intersection of Poplar street? This is giving the word "inclusive" three meanings wherever it is used. My impression is that the court intended to assign as prison bounds that space of ground which is included in a line drawn on the north side of Tuscarawas street, and continued by making a right angle at the junction of Tuscarawas and Walnut streets, and running north on the west side of said Walnut street to the north line of the *in-lots* of said town, thence on said north line west to the east side of Poplar street, and thence on the east side of Poplar street until this line intersects the aforesaid line drawn on the north side of Tuscarawas street. No other supposition would allow to them an intention that was rational. If this was their intention and the court are of opinion they can give that intention effect, by saying that such a line as above described was the 57] *line constituting the limits of the liberties of the jail, *"laid off and assigned by metes and bounds,"* the plaintiff is entitled to judgment; for the facts agreed show that James Brandon committed an escape by going into "the middle of Tuscarawas street."

Again, how can it possibly be said, that the "bounds" assigned by the court run on the south side of Tuscarawas, the east side of Walnut, the west side of Poplar streets, and on the north boundary of the in-lots: such *lines* can not be made, by any language used by the court, if they had employed the word *inclusive* twenty times oftener, *to meet, so as to include any certain space.*

But the law requires the court to lay off and assign the prison bounds by *metes and bounds:* have they done this? It would be preposterous to say they had. What do these words, "*metes and bounds,*" signify in law, and in what sense are they to be interpreted? They are employed here as describing a certain space of ground to be laid off and assigned by the court; they must be construed to mean *visible monuments or marks, designating the distance and outer limits of the prison bounds.* Whether any such visible monuments or marks have been placed or erected, I need not ask; nor need I, I imagine, remark, though I can not well refrain from it, that the *laying off and assigning* merely, is not a comple-

tion of the duty of the court, but they must do it by "*metes and bounds.*"

Again, the "prison bounds" are to be laid off and assigned by metes and bounds *around and adjoining the jail.* No land or space of ground that does not *adjoin* the jail can be assigned, I suppose, because there is no authority to do so; what, then, is not attached to, or does not belong to, or pertain to the jail, does not *adjoin it.* If A. and B. each own a lot in Canton, and D. owns one that lies between them, they do not *adjoin.* D. and B. adjoin; so do D. and A.; but A. and B. no more adjoin than the county of Hamilton *adjoins* the county of Ashtabula; and it will make no difference whether we apply to Lord Kaimes or Lord Coke, or Jacobs or Walker, for the meaning of the word *adjoin.*

These different views, which I have endeavored to present with as little prolixity as possible, will show the danger and uncertainty which must result by a departure from the settled principles and doctrines of the interpretation of statutes; and that to bring private property within the walls of the prison, as a component part of the jail, every species of violence must be committed upon the language of the law, the decisions of courts, and the common sense of mankind.

*I will conclude by observing, that if there be no *bounds laid* [58 *off and assigned*, it is not the fault of the plaintiff. *He* is called upon not only to concede all on his side, but must support the defendant into the bargain. It is the sheriff's and debtor's business to look to the limits, to know if any are assigned, and to keep within undisputed bounds. Kip *v.* Brigham, 7 Johns. 168; Bissell *v.* Kip, 5 Johns. 89. For the inquiry is here, whether the defendant committed a breach of the condition of the bond, which condition is like that of all the bonds required by the statutes of the different states, that the debtor should remain a "true prisoner in the custody of the jailer, and not go out of the limits."

HARRIS was counsel for defendant, but presented no argument.

By the COURT:

The first point made is, that the plaintiff ought to have personal notice that a debtor in prison has made oath that he is unable to support himself, before the prisoner can be discharged. Where the residence of the plaintiff, or his attorney,

is known, this notice ought to be given, and it ought to be given in a reasonable manner, so as to produce effect. Whether it were most reasonable to give it to the party, or to the attorney, must depend upon the circumstances of each particular case.

A creditor can not be said to neglect or refuse to support the prisoner, when he has no knowledge that such support is required of him. This notice, therefore, can not be dispensed with, unless it is impossible to give it, as where the residence both of plaintiff and attorney, or other agent, can not be ascertained, which can seldom happen. In this case, the notice was given to the attorney. The attorney acted upon it, and furnished support for a time. This was an acceptance of notice, and it is too late for the plaintiff to object to the want of it.

The second point made is, that the prison bounds can not be extended over private property, so as to authorize the prisoner to enter private houses, or labor on private grounds, within the condition of his bond. The court can not adopt the reasoning by which it is attempted to sustain this position, and the rejection does not include the proposition that the prisoner acquires a right to go where he pleases upon private property, without the consent of the owner. The prisoner acquires, within the limits of the prison bounds, no other right than that enjoyed by every other citizen, to associate where admitted, and to labor where employed. 59] The *public assumes no other control over the property or persons within the bounds than over the property and persons of other citizens. Within the bounds prescribed, the rights of the prisoner are the same that he would enjoy were he not imprisoned. This is what the law intended to confer, and the practice under it has been uniform in adopting this interpretation.

It was not the object of the law to permit air and exercise only. It intended to afford an opportunity to labor, to employ himself if he could, for the support of himself and family. Any other construction would make him a mere idle saunterer in the streets, exposed to the temptation of vicious indulgence, and setting an evil example to others.

The statute directs that bounds may be laid off and assigned around and adjoining the prison, so that these bounds shall not extend more than four hundred yards in any direction from the jail. A subsequent law extends the prison bounds to the corporation limits of the town in which the jail is situate, or if the town

be not incorporated, then to the limits of the recorded town plat. According to the plaintiff's argument, the prisoner may range within these limits anywhere upon the public ground, and the public streets and alleys, but he can go nowhere else. He must retire to the jail to sleep, to eat, and to perform all the offices of nature, or these must be attended to in the public streets. Such a construction was never thought of by our legislators; it therefore could not have been intended by them. The court have not looked into the authorities cited by the plaintiff on this point; they could not adopt them if they sustain his position. The question stands too clear upon principle and sound practical good sense, to be decided against these, in deference to any authority.

The third point is, that the rules assigned by the court of common pleas are not defined by metes and bounds, and therefore do not so exist as to warrant the prisoner going at large. If this point is well taken, it can not entitle the plaintiff to recover upon the prison bounds bond. If no bounds were assigned, the bond was taken without authority, and against law. The sheriff might be liable for an escape, but the bond could not be sustained. The point, however, is not well taken. The assignment of limits or bounds is clear and certain. These bounds are mathematical lines, not visible actual monuments. It never was intended that the bounds around the jail, extending in each direction four hundred yards, should be wholly inclosed by visible actual monuments. Upon the *plaintiff's argument, these must be continuous [60 around the whole area of the limits. If monuments be set up at certain points, and the line between described only mathematically, it would not be sufficient. The space between the monuments would not be designated with that certainty which is contended for. This consequence of the argument would seem sufficient to show that it is not tenable.

It is lastly contended for the plaintiff, that Tuscarawas street is not included within the bounds as assigned by the court. These bounds are extended " south of the jail to Tuscarawas street *inclusive.*" This term includes Tuscarawas street and establishes the southern line of that street as the southern limits of the bounds. The bounds further extend west of the jail to Poplar street, inclusive. East of the jail, as far as Walnut street in Canton, inclusive. Tuscarawas street, from its intersection with Poplar street, west, and Walnut street, east, is thus clearly included within the bounds.

63

The prisoner was not out of the bounds when upon Tuscarawas street, anywhere between its intersection with Poplar and Walnut streets. The case agreed does not show that he was on that street, east or west of this intersection. It does not therefore show him out of the bounds.

Judgment must be for the defendant.